# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**ALFRED ANDERSON,**

       **Petitioner,**

  **v.**                       **CASE NO. 2:08-CV-417**
                                    **JUDGE MARBLEY**
                                    **MAGISTRATE JUDGE KING**

**ROBIN KNAB, Warden,**

       **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the petition, Doc. No. 3, respondent's return of writ, Doc. No. 8, petitioner's traverse, Doc. No. 14, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMEND**S that this action be **DISMISSED.**

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> The Franklin County Grand Jury indicted appellant on: (1) one count of attempted murder with a firearm specification, a first-degree felony, in violation of R.C. 2923.02 (as it relates to R.C. 2903.02) and 2941.145, respectively; (2) one count of felonious assault with a firearm specification, a second-degree felony, in violation of R.C. 2903.11 and 2941.145, respectively; and (3) one count of having a weapon while under disability, a third-degree felony, in violation of R.C. 2923.13. The charges stem from appellant shooting Jamile Davis on August 14, 2005.
>
> Appellant pled not guilty to the charges, and a jury trial

ensued. At trial, Columbus Police Detective David Harrington testified as follows on behalf of plaintiff-appellee, the State of Ohio. On August 14, 2005, Detective Harrington arrived at appellant's house to investigate the shooting of Davis. Inside appellant's house, Detective Harrington saw that Davis was on the ground "suffering what happened to be a gunshot wound to her neck." (Tr. at 27.) Detective Harrington noticed that appellant was "trying to treat [Davis] or keep her conscious[.]" (Tr. at 27 .) Detective Harrington tried to ask Davis about what had happened, but Davis was unresponsive. Eventually, medics arrived and transported Davis to the hospital. Later, Detective Harrington went to the hospital to interview Davis. At the hospital, Davis was unable to verbally communicate, and, therefore, Detective Harrington asked Davis "to blink once for yes and twice for no in response to [his] questions." (Tr. at 40.) After interviewing Davis, Detective Harrington concluded that appellant was a suspect in the shooting.

Next, during Detective Harrington's direct examination, appellee showed the detective Exhibit 2, a photograph of Davis with an intubation tube. Appellant's trial counsel objected, and the trial court ruled that appellee may only ask whether the photograph "accurately reflect[s] the victim at the time he talked to her." (Tr. at 38.) Thus, appellee asked the question about Exhibit 2 allowed by the trial court, and Detective Harrington responded affirmatively.

Detective Harrington further testified that, when he first arrived at the scene of the shooting, appellant stated that "it had been * * * a drive-by style shooting, and * * * the victim had been shot outside[.]" (Tr. at 54.) However, the detective testified that he discounted appellant's explanation because he saw no damage to the exterior of appellant's house.

Columbus Police Officer Scott Plate also investigated the August 14, 2005 shooting and testified to the following on appellee's behalf. At appellant's house, Officer Plate saw that Davis had a wound to her neck and was lying on the floor. Appellant "was holding some of the paper towels to [Davis'] neck; [and] appeared to be very upset[.]" (Tr. at 84.) Appellant stated: " 'Somebody shot my baby[.]' " (Tr. at 84.) Appellant

also "said something along the lines * * * like, 'I'll get the guy for this[.]' " (Tr. at 85.) Officer Plate also found a shell casing for a bullet.

Columbus Police Officer Troy Hammel also investigated the August 14, 2005 shooting and testified to the following on appellee's behalf. Inside appellant's house, Officer Hammel saw Davis lying on the floor. Davis had a neck injury, and appellant was treating Davis' wound with "some sort of cloth [.]" (Tr. at 111.) Appellant "stated that the shooting happened outside." (Tr. at 112.) However, Officer Hammel found no "bullet casings, no bullet holes, no blood, no evidence of any crime outside the residence." (Tr. at 114.) Officer Hammel did notice a shell casing inside the house.

Medic Steve Carna transported Davis to the hospital on August 14, 2005, and testified that, at appellant's house, Carna saw appellant "guarding" Davis while Davis was lying on the floor. (Tr. at 131.) Carna also testified that Davis had a neck wound, her blood pressure was low and her breathing was "labored." (Tr. at 139.) According to Carna, "if we did not do some very quick treatment then [Davis] * * * was possibly going to die because [her] blood pressure was low." (Tr. at 139.)

On cross-examination, Carna noted that appellant was angry and that Davis "was a little bit lethargic * * * but she was appropriate * * * with speaking and answering questions[.]" (Tr. at 144.) On re-direct examination, Carna reiterated that, "[i]f we would have not provided proper medical attention, [Davis] would most likely in my opinion died at the scene." (Tr. at 146.)

Next, Columbus Police Detective James Porter testified that police executed a search warrant at appellant's house. According to Detective Porter, a .38 caliber revolver was found "inside of a broken washing machine" at the "rear" of appellant's house. (Tr. at 163.) Additionally, Detective Porter identified at trial Exhibit 28 as the firearm that was removed from the washing machine. Detective Porter also testified that police found two spent shell casings at appellant's house and, in particular, one of the shell casings on the floor of appellant's

home.

Columbus Police Criminalist Heather McClellan testified to the following on appellee's behalf. McClellan previously analyzed Exhibit 28, the .38 caliber firearm, and the spent shell casings that police found at appellant's house. McClellan opined that "the spent [shell] casings received in this case were fired by" the .38 caliber firearm. (Tr. at 199.) On cross-examination, McClellan noted the .38 caliber firearm of this case:

* * * [F]ires both single action and double action. * * * Single action, you cock the hammer manually, and then pull the trigger, and the hammer only falls one direction.

Double action with the pull of the trigger the hammer both cocks and falls forward. * * * So single action is a 3-pound trigger pull. And double action was an 8-pound trigger pull.

(Tr. at 208.)

Davis testified to the following on appellee's behalf. Davis dated appellant "off and on for about four years." (Tr. at 220.) Appellant and Davis were not dating on August 14, 2005. On the morning of August 14, 2005, Davis called appellant and they agreed to socialize later that day at appellant's house. Around 2:00 p.m., appellant came to Davis' house to drive Davis and her six-year-old daughter to his house.

At appellant's house, Davis took her daughter upstairs to watch television in a bedroom. In the bedroom, Davis saw a firearm "by the fish tank [.]" (Tr. at 227.) Davis put the firearm on the floor because the bed where Davis' daughter was sitting was "real high." (Tr. at 228.) Davis went downstairs and asked appellant about the firearm. Appellant wanted Davis to bring the firearm downstairs. Davis retrieved the firearm, went back downstairs, and "put [the firearm] on the mantle behind a black vase." (Tr. at 228.) Davis verified at trial that Exhibit 28, the .38 caliber firearm, was the firearm that she brought downstairs.

Davis then testified to the following. Appellant, Davis, and

appellant's friend, Steve Pearson, started to drink alcohol, and appellant and Davis also smoked marijuana. Davis received a call on her cell phone from Rick Currenton, whom she had started to date. After the phone conversation ended, appellant and Davis had a "confrontation" about Currenton because appellant "never liked * * * [Davis] talking to [Currenton] while [she] was" at appellant's house. (Tr. at 234.) The confrontation lasted approximately five minutes before appellant calmed down and continued to drink.

Appellant thereafter obtained the firearm and put two bullets in it. Davis asked appellant why he was playing with the firearm, and appellant responded: "[W]ell, you can see where the bullets [are]." (Tr. at 238.) Appellant likes to play with firearms; when "he has company over at the house, he * * * pulls out a gun, [and] shows it to people[.]" (Tr. at 239.)

While appellant had the firearm, Davis was "getting kind of scared [,]" and he knew that Davis did not "really like to be around guns[.]" (Tr. at 239-240.) Thus, Davis tried to leave the area where appellant was handling the firearm, but appellant "was right on [her] back." (Tr. at 240.) Davis turned around, and appellant put the firearm "to [her] left side." (Tr. at 240.) Next, "[appellant] put [the firearm] up to [Davis'] neck * * * and [Davis] pushed the gun away the first time." (Tr. at 240-241.) Then:

[Davis] said, "What the fuck are you doing?" And [appellant] just put the gun back, and pow. Everything went deaf. And [Davis was] still looking at [appellant,] [b]ecause [she] was in shock. [Davis] couldn't believe it. It was going through [Davis'] head * * * like [she was] going to die and [her] daughter [was] upstairs. And [Davis thought that appellant] was shocked that he shot [Davis]. And blood started coming out as [Davis was] falling to the floor. [Appellant then stated], "I shot her, Steve. I shot her, Steve." [Appellant also stated], "Baby, don't die on me." * * *

(Tr. at 241.)

Thereafter, appellant asked Pearson to hold Davis while

appellant called 911. Davis had Pearson " 'get a towel and put it up to [her] neck and hold it tight.' " (Tr. at 241.) Shortly thereafter, Davis passed out and later "woke up in the ambulance." (Tr. at 242.) Davis was hospitalized for approximately two months, one month of which was for physical therapy. At trial, appellee asked Davis if Exhibit 2 was a fair and accurate representation of her at the hospital. Appellant's trial counsel objected, and the trial court overruled the objection. However, appellant's trial counsel asked to discuss the matter further, claiming in part that the photograph was "irrelevant to any testimony as to * * * [his] client's guilt or innocence and really only done for effect at this point." (Tr. at 247-248.) The trial court then concluded:

We've already identified and the officer identified that he saw the person at the hospital, and that that person was this witness, and that's how she looked. So I think the identification of that picture to the extent that it's necessary has already been completed for the issue of admissibility. I will deal with the emotion issue later. So I will sustain the objection at this time.

(Tr. at 248.)

Davis continued to testify to the following. While at the hospital, police interviewed Davis about the shooting incident, and Davis stated that appellant shot her. Since the shooting, Davis uses an electric wheelchair, and she had previously worn a neck brace. Davis cannot use her legs, and doctors "really don't know if [Davis is] going to be able to walk." (Tr. at 254.) Davis can move her hands, but Davis cannot make a fist. Likewise, Davis is continuing her painful physical therapy.

On cross-examination, Davis first testified that she did not think the shooting incident was an accident and noted: "Why would somebody put a gun to somebody's neck at all?" (Tr. at 258.) Later during the cross-examination, appellant's trial counsel asked Davis: "And you don't think this was an accident at all? You think he had to do it on purpose?" (Tr. at 272.) Davis answered: "I don't know." (Tr. at 272.)

Further, on cross-examination, Davis reiterated the events of

the shooting:

\* \* \* [Appellant] put the gun up to my neck, to the left side of my neck. I smacked the gun away, asked him what he was doing. He put the gun back so quick and pulled the trigger.

(Tr. at 273.)

Davis then noted the following on cross-examination. After the shooting, appellant first just "stared. Maybe it looked like he didn't know he shot me until blood start[ed] coming out and I started falling to the ground. And that's when \* \* \* I think he really realized he shot me." (Tr. at 274.) Davis also thought that appellant was really concerned about her after the shooting.

Subsequently, appellee sought to admit into evidence its exhibits, including Exhibit 2. Again, appellant's trial counsel objected to the admission of Exhibit 2, but the trial court overruled the objection and admitted the exhibit into evidence. Next, the parties stipulated that appellant was previously convicted of attempted abduction, a felony.

Appellant then testified to the following on his own behalf. On August 14, 2005, appellant socialized with Davis at his home. Pearson was also at appellant's home because appellant hired him to clean. The individuals started to drink alcohol, and, in the course of events, Davis asked appellant why he kept a firearm upstairs. Appellant denied that there was a firearm upstairs, and Davis showed appellant the firearm and placed the firearm on the mantle. The firearm belonged to appellant's friend, Davey Scott, who had been staying with appellant for a week and had slept in appellant's bedroom.

Thereafter, appellant retrieved the firearm. Initially, appellant did not think that the firearm was loaded, but appellant eventually saw bullets in the firearm. Thus, appellant "let [Davis] know that [the firearm] was loaded" given "the way she was carrying it downstairs." (Tr. at 308.) Appellant then "opened [the firearm] up and spinned it." (Tr. at 312.) Appellant also "took one of the shells out" of the firearm and showed it to Davis before putting the shell back in the firearm.

(Tr. at 312.)

Appellant acknowledged that Davis received a phone call from Currenton, but stated that he did not become upset about the call. Afterwards, Davis said that she was going to use the bathroom, and appellant followed her because they had been caressing each other throughout the day, and appellant "was going to play with her for a little bit." (Tr. at 315.) Appellant was only "about two steps" behind Davis, and appellant was holding the firearm "to the light" and "spinning" the firearm. (Tr. at 320, 318.) Thereafter:

* * * [Appellant] was going to take [the firearm] and put it * * * out [of] the way. In the process while [Davis] was going, she [forgot] that [appellant] was standing behind her.

* * *

[Davis] turned around and she jumped. * * * [Davis] hit [appellant's] hand and the gun went off.

* * *

* * * [Davis] said, "Baby, I've been hit." And [appellant] dropped the gun on the ground. And [appellant] grabbed [Davis]. [Appellant] laid [Davis] on the couch. [Appellant] said, "Baby, don't die on me, please don't die." Then [appellant] picked [Davis] up. [Appellant] called [Pearson]. [Appellant] told [Pearson to] hand [appellant] the phone. [Appellant] called 911 several times. And [appellant] carried [Davis] into the other room and laid her in [his] lap. And [appellant] was just sitting there holding [Davis] and told her, "Don't die, man."

(Tr. at 318-319.) After the shooting, appellant "was stunned for a minute." (Tr. at 320.) While tending to Davis after the shooting, appellant put ice and a rag on Davis' wound.

Appellant stated that he did not intend to shoot Davis, and he did not think that such a shooting "could happen" from him

playing with the firearm. (Tr. at 322.) Prior to the shooting, appellant had not been arguing or screaming with Davis.

On cross-examination, appellant admitted that he and Davis smoked marijuana on August 14, 2005. Appellant also testified that he is familiar with firearms and that he had previously shot firearms. Appellant also testified on cross-examination that, when he was handling the firearm on August 14, 2005, he had his finger "on the trigger in a position from which [he] can fire it [.]" (Tr. at 348.) Additionally, appellant verified on cross-examination that, to discharge the firearm, one would "[s]queeze the trigger." (Tr. at 350.) Next, appellant acknowledged that the firearm he was handling was in "double action" mode that took eight pounds of pressure to pull the trigger. (Tr. at 350.) However, on cross-examination, appellant denied that he held the firearm to Davis' neck.

On re-direct examination, appellant testified that Davis also brought a shell casing downstairs with her. Appellant then threw the shell casing on the floor for "no reason." (Tr. at 371.)

Afterwards, during the trial, appellant pled guilty to the having a weapon while under disability charge, and the trial court accepted the guilty plea. Thereafter, during closing argument, appellee mentioned appellant's prior felony conviction for attempted abduction, and appellee noted that the jury could consider the conviction when analyzing appellant's credibility.

Before the jury deliberated, the trial court provided jury instructions. The trial court instructed the jury, in pertinent part, on felonious assault by stating:

* * * Before you can find the defendant guilty of felonious assault, you must find beyond a reasonable doubt that on or about the 14th day of August, 2005, in Franklin County, Ohio, [appellant] knowingly caused serious physical harm to Jamile Davis and/or caused or attempted to cause physical harm to Jamile Davis by means of a deadly weapon, to wit, a firearm.

(Tr. at 497.) However, the trial court declined to give appellee's

requested jury instruction on negligent assault as a lesser-included offense to felonious assault.

Ultimately, the jury found appellant not guilty of attempted murder, but guilty of felonious assault and the accompanying firearm specification. On January 25, 2006, the trial court held a sentencing hearing. Applying Ohio's felony sentencing statutes, the trial court declined to impose the minimum authorized prison sentence for the felonious assault conviction upon noting that "the shortest term does not adequately protect the public" and "the shortest term would demean the seriousness of the offense." (Tr. at 536.) Rather, the trial court imposed the maximum eight-year prison sentence for the felonious assault conviction upon determining that appellant "will commit crimes again" and that appellant committed the "worst form of felonious assault [.]" (Tr. at 537.) The trial court imposed a concurrent two-year prison sentence on the having a weapon under disability conviction, and, on the firearm specification that accompanied the felonious assault conviction, the trial court imposed a one-year prison sentence to be served consecutive with the other sentences.

*State v. Anderson,* 2006 WL 3365497 (Ohio App. 10th Dist. November 21, 2006). Petitioner

filed a timely appeal in which he asserted the following assignments of error:

1. THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT BY ALLOWING A PHOTOGRAPH OF THE VICTIM TO BE SHOWN TO THE JURY AND ADMITTED INTO EVIDENCE WHERE THE DANGER OF UNFAIR PREJUDICE SUBSTANTIALLY OUTWEIGHED THE PHOTOGRAPH'S PROBATIVE VALUE.

2. THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF NEGLIGENT ASSAULT.

3. THE TRIAL COURT ERRED WHEN IT SENTENCED APPELLANT TO A MAXIMUM SENTENCE BASED UPON FACTS NOT FOUND BY A JURY OR ADMITTED BY APPELLANT.

> 4. THE JURY VERDICT OF GUILTY WAS AGAINST THE
> MANIFEST WEIGHT OF THE EVIDENCE.

*See id.* On November 21, 2006, the appellate court affirmed the trial court's judgment. *Id.* Petitioner filed a timely appeal to the Ohio Supreme Court. Petitioner filed a motion to certify conflict as to whether *State v. Foster*, 109 Ohio St.3d 1 (2006), required reversal of a sentence regardless of whether the defendant objected at sentencing. *Exhibit 9 to Return of Writ*. On February 6, 2007, the appellate court denied petitioner's motion as untimely. *Exhibit 11 to Return of Writ*. Petitioner filed a timely appeal to the Ohio Supreme Court. He asserted the following propositions of law:

> 1. Sentences that violate *Blakely* are void and can be challenged on direct appeal without objection in the trial court.
>
> 2. The remedy set forth in *State v. Foster* violates the Ex Post Facto and Due Process Clauses of the United States Constitution.
>
> 3. Trial counsel is ineffective for failing to raise *Blakely* error, and appellate counsel is ineffective for failing to raise trial counsel's ineffectiveness and plain error, when the failure to properly preserve the issue results in the affirmance of the maximum possible sentence.

*Exhibit 13 to Return of Writ*. On April 18, 2007, the Ohio Supreme Court accepted the appeal on Propositions of Law 1 and 3, and held the case in abeyance pending a decision in *State v. Payne*, 114 Ohio St.3d 502 (2007). *Exhibit 15 to Return of Writ*. On October 24, 2007, the Ohio Supreme Court affirmed the Court of Appeals as to Proposition of Law 1 and *sua sponte* dismissed the appeal as "improvidently accepted" on Proposition of Law 3. *Exhibit 16 to Return of Writ*.

Now represented by the Ohio Public Defender, petitioner filed this action pursuant to 28 U.S.C. §2254 on May 2, 2008. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

1. Petitioner was denied his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States of America, when the trial court sentenced Petitioner to the maximum sentence based on facts neither presented to the jury nor admitted by Petitioner.

2. The remedy set forth in *State v. Foster* violates Petitioner's right to protection against Ex Post Facto laws and violates his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States of America.

3. Petitioner was denied the effective assistance of trial and appellate counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution when trial counsel failed to object to his illegal maximum sentence and appellate counsel failed to raise the issue of trial counsel's ineffectiveness.

It is the position of the respondent that petitioner's claims are procedurally defaulted or without merit.

## PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may

present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless,* 459 U.S. 4, 6 (1982)( *per curiam* ); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.*

In claim one, petitioner asserts that imposition of the maximum term of eight years incarceration on his felonious assault conviction based on judicial fact finding violated

*Blakely v. Washington,* 542 U.S. 296 (2004). This claim, being readily apparent from the

record was properly raised on direct appeal; however, the state appellate court rejected the

claim as having been waived because petitioner failed to object at sentencing:

> [A]ppellant contends that the trial court erred by sentencing
> appellant to the maximum authorized prison sentence for his
> felonious assault conviction instead of the minimum
> authorized prison sentence. In particular, appellant asserts that
> the trial court imposed the sentence in violation of jury trial
> principles afforded by the Sixth Amendment to the United
> States Constitution and in contravention of *Blakely v.
> Washington* (2004), 542 U.S. 296, and *State v. Foster*, 109 Ohio
> St.3d 1, 2006-Ohio-856.
>
> *Blakely* stems from *Apprendi v. New Jersey* (2000), 530 U.S. 466,
> 490, wherein the United States Supreme Court held that,
> "[o]ther than the fact of a prior conviction, any fact that
> increases the penalty for a crime beyond the prescribed
> statutory maximum must be submitted to a jury, and proved
> beyond a reasonable doubt." *Id.* at 490. Otherwise, the sentence
> violates a defendant's right to a jury trial under the Sixth
> Amendment to the United States Constitution and Fourteenth
> Amendment due process guarantees. *Apprendi* at 476-478, 497.
> In *Blakely,* the United States Supreme Court defined "
> 'statutory maximum' for *Apprendi* purposes" as "the maximum
> sentence a judge may impose solely on the basis of the facts
> reflected in the jury verdict or admitted by the defendant."
> *Blakely* at 303.
>
> Since appellant's sentencing, the Ohio Supreme Court decided
> the applicability of *Blakely* to Ohio's felony sentencing laws in
> *Foster.* In *Foster,* the Ohio Supreme Court concluded that
> portions of Ohio's felony sentencing statutes violate the Sixth
> Amendment to the United States Constitution in the manner
> set forth in *Blakely. Foster* at ¶ 50-83. In particular, the Ohio
> Supreme Court declared unconstitutional the statutes involved
> in appellant's case: (1) R.C. 2929.14(B), a statute governing a
> trial court's decision not to impose the minimum authorized
> prison sentence for felonious assault; and (2) R.C. 2929.14(C),

a statute governing the trial court's decision to impose the maximum authorized prison sentence for felonious assault. *See Foster* at ¶ 83. Thus, in *Foster*, the Ohio Supreme Court severed the unconstitutional statutes from Ohio's felony sentencing laws. *Id*. at ¶ 99. The Ohio Supreme Court then concluded that cases pending on direct review "must be remanded to trial courts for new sentencing hearings [.]" *Id*. at ¶ 104.

In *State v. Draughon*, Franklin App. No. 05AP-860, 2006-Ohio-2445, at ¶ 7, we acknowledged the "broad language the Supreme Court of Ohio used in *Foster* when it ordered resentencing for all cases pending on direct review." However, we concluded that "a defendant who did not assert a *Blakely* challenge in the trial court waives that challenge and is not entitled to a resentencing hearing based on *Foster*." *Id*. In concluding as such, we "consider[ed] the language used in *United States v. Booker* (2005), 543 U.S. 220, 125 S.Ct. 738, the case that *Foster* relied on in arriving at" its decision to sever the unconstitutional statutes from Ohio's felony sentencing laws. *Draughon* at ¶ 7. "In *Booker,* the United States Supreme Court applied *Blakely* to the Federal Sentencing Guidelines. The *Booker* Court applied its holding to all cases on direct review." *Draughon* at ¶ 7. However, the *Booker* court "expected reviewing courts to apply 'ordinary prudential doctrines,' such as waiver * * * to determine whether to remand a case for a new sentencing." *Draughon* at ¶ 7, quoting *Booker* at 268. "Thus, in accordance with the well-settled doctrine of waiver of constitutional challenges, and the language in *Booker*, we [held] that a *Blakely* challenge is waived by a defendant sentenced after *Blakely* if it was not raised in the trial court." *Draughon* at ¶ 8; *see, also, Washington v. Recuenco* (2006), --- U.S. ----, 126 S.Ct. 2546 (holding that constitutional error under *Blakely* does not provide for automatic reversal).

Here, the trial court sentenced appellant after the United States Supreme Court issued *Blakely.* Thus, appellant could have objected to his felonious assault sentence based on *Blakely* and the constitutionality of Ohio's sentencing scheme. Appellant did not do so. Therefore, pursuant to *Draughon*, we conclude that appellant waived his *Blakely* argument on appeal in

> regards to his felonious assault sentence and is not entitled to
> a resentencing hearing based on *Foster. See Draughon* at ¶ 7.

*State v. Anderson, supra.* Respondent therefore contends that this claim is procedurally

defaulted.

As noted *supra*, the trial court sentenced petitioner on January 25, 2006, and entered

judgment on January 31, 2006 *i.e.,* long after the United States Supreme Court's June 24,

2004, decision in *Blakely*, but prior to the Ohio Supreme Court's February 26, 2006, decision

in *State v. Foster*, 109 Ohio St.3d 1 (2006)(invalidating fact-finding provisions of Ohio's

sentencing statutes as unconstitutional under *Blakely).* Still, trial counsel did not raise a

*Blakely* objection at sentencing. The appellate court affirmed petitioner's convictions on

November 21, 2006, and the Ohio Supreme Court dismissed petitioner's appeal on October

24, 2007.

Although the state appellate court refused to consider the merits of petitioner's

*Blakely* claim because petitioner had failed to object at sentencing, it does not appear that

the Ohio courts consistently required such an objection at sentencing in order to preserve

a *Blakely* error for appellate review. Particularly was this true at the time of petitioner's

appeal and in regard to defendants who, like petitioner, were sentenced after *Blakely* but

whose case remained pending on appeal at the time *Foster* was decided.

In *Foster,* the Ohio Supreme Court remanded for resentencing all cases then pending

on direct review. *State v. Foster, supra,* 109 Ohio St.3d at 31. The issue of whether a

defendant would be required to make a contemporaneous objection based on *Blakely* was

not before the Supreme Court in *Foster* and was therefore not addressed in *Foster*. After

*Blakely,* Ohio appellate courts were divided on whether a failure to raise a *Blakely* objection

at sentencing precluded appellate review of that claim. For example, the Ohio Seventh

District Court of Appeals in *State v. Scranton Buchanan,* 2006 WL 3059911 (Ohio App. 7th

Dist. October 26, 2006), declined to adopt such a rule:

> [T]he Ninth and Tenth Appellate Districts have found that
> *Foster* issues in some situations are waived if they are not
> raised to the trial court. *State v. Silverman,* 10th Dist. Nos. 05AP-
> 837, 05AP-838, 05AP839, 2006-Ohio-3826, ¶ 139-141; *State v.
> Jones,* 9th Dist. No. 22811, 2006-Ohio-1820. The Sixth Appellate
> District, however, has determined that the principles of waiver
> are inapplicable in the *Foster* analysis. *State v. Brinkman,* 6th
> Dist. No. WD-05-058, 2006-Ohio-3868, 168 Ohio App.3d 245,
> 859 N.E.2d 595. The situations in which these districts are
> addressing waiver are where the defendant was sentenced
> after *Blakely* was decided and failed to raise *Blakely* and its
> principles to the sentencing court. The matter at hand is one of
> those situations. *Buchanan* was sentenced post-*Blakely* and the
> record is devoid of any indication that Buchanan raised any
> *Blakely* issue with the sentencing court. Accordingly, we must
> determine whether the principles of waiver are applicable in
> this situation.
>
> The Ohio Supreme Court addressed waiver in the *Foster*
> opinion. However, the defendants in *Foster* were sentenced
> pre-*Blakely.* The *Foster* holding clearly indicates that if a
> defendant had been sentenced prior to the decision in *Blakely*
> and does not make an argument about the potential
> unconstitutionality of Ohio's felony sentencing scheme, the
> argument is not waived. *Foster,* at ¶ 30-33, 845 N.E.2d 470.
> However, *Foster* does not speak to the situation where a
> defendant was sentenced after *Blakely* was decided and failed
> to raise issues concerning *Blakely* and Ohio's felony sentencing
> scheme.
>
> As stated above, the Ninth and Tenth Appellate Districts have

stated that defendants sentenced post *Blakely* and who did not raise *Blakely* to the sentencing court have waived any such argument.

\* \* \*

On the other hand, the Sixth Appellate District has taken the opposite view. *State v. Brinkman,* 6th Dist. No. WD-05-058, 2006-Ohio-3868, 168 Ohio App.3d 245, 859 N.E.2d 595. It explained:

\* \* \*

In making such a holding, the Sixth Appellate District acknowledged that its decision was in conflict with the Ninth and Tenth Appellate Districts. As such, it certified a conflict to the Ohio Supreme Court on July 28, 2006.

After reviewing our sister districts' analysis on the issue, we tend to agree with the Sixth Appellate District. We agree that the principles of waiver do not apply to *Foster.*

*Id.* The Ohio Supreme Court resolved this conflict in *State v. Payne*, 114 Ohio St.3d 502, 506

(2007), holding that a defendant sentenced after *Blakely* who failed to raise the objection at

sentencing forfeited the error for appellate review. The defendant in *Payne* was in the same

circumstances as petitioner Anderson: he was sentenced after *Blakely* but had made no

*Blakely* objection at sentencing; his appeal was pending when *Foster* was decided.

The Supreme Court of Ohio acknowledged in *Payne* that it remanded a number of

cases on its docket that raised *Blakely* issues without addressing whether Ohio's

contemporaneous objection rule barred appellate review:

In *Foster* and similar appellate cases, we remanded a large number of cases already in the appellate phase for resentencing hearings without any mention of forfeiture. *Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 3-7. The remand

orders were silent as to the issue currently confronting us.

> We recognize that this court remanded for resentencing some cases in which the initial sentencing by the trial court had occurred after *Blakely* was decided, but where the defendant had seemingly failed to object on *Blakely* grounds to the sentence imposed. See, e.g., *State v. Kendrick,* 2d Dist. No. 20965, 2006-Ohio-311, 2006 WL 202141, judgment reversed by *In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 411, 2006-Ohio-2394, 848 N.E.2d 809, ¶ 19. However, this court did not then definitively resolve the issue presented by this case; thus, it is appropriate to do so now.

*State v. Payne, supra*, 114 Ohio State 3d at 504. (footnote omitted). Noting that "[a] reported decision, although a case where the question might have been raised, is entitled to no consideration whatever as settling * * * a question not passed upon or raised at the time of the adjudication," the Ohio Supreme Court held a failure to raise a *Blakely* error at sentencing waives such error on appeal. *State v. Payne, supra*, 114 Ohio State 3d at 504-05, 506 (citing *State ex rel. Gordon v. Rhodes* (1952), 158 Ohio St. 129, paragraph one of the syllabus).

Regardless, however, of whether petitioner waived his *Blakely* claim by failing to raise the objection at sentencing, review of the record indicates that the trial court sentenced petitioner based on facts submitted at trial and on his prior criminal record:

> I think the overwhelming fact that [be]comes clear in this case, and we see it all too often, is the very unforgiving nature of a gun when it's fired. It is unforgiving...

> [L]et me start with the remorse issue. I may disagree with the state a little bit on the remorse side. I think there was – some of the facts indicated some remorse. It's always difficult .... I don't have [the] ability to look inside people and make that

final decision, but I felt there was some there.

Obviously the act wasn't intentional, but the conduct was so clearly knowingly. I mean, there's just no way this court could ever conclude that the actions, as the jury did, [were] accidental.

I mean, Mr. Anderson, you knew you weren't supposed to have a gun. And if we believe the stories we were told, the first movement of the gun to the extent you can say there's anything responsible about having a gun in the house with children was not – was probably on the positive side. As I recall it was taken out of the bedroom and put onto the mantle. That was probably the last good thing that happened. That was the last good thing.

Then when the conduct went on from there it didn't just fall off the mantle and discharge. You had to go and get that gun. You had to use it. You had to be playing with it. The fact that you were drinking or using drugs, I don't understand where we've come up with this mentality of late that if you're using drugs that's an excuse for your behavior. No. It makes it worse; at least to me it does. It makes it worse, not better. It's not an excuse. To me it should have extra consequences.

And I believe Miss Davis' characterization of what happened that day when you held that gun to her. It may not have been intentional. But the conduct was so overwhelmingly knowing. And as defined for us, you have knowledge of the circumstances when you are aware that such circumstances probably exist. Conducting yourself with that gun, drinking, drugs, with Miss Davis, to me it's extremely clear.

The court does note the factors that it's supposed to consider together with the purposes and principles of sentencing regarding the issues of punishment and protecting the public. The court does note the prior criminal history of the defendant as reported in the presentence investigation; and obviously the extreme serious physical harm that and psychological harm that it's caused together with the relationship which certainly did facilitate this offense.

> The court takes all those matters into consideration. The court notes the defendant's never been to prison. And the guidance there is that I'm supposed to give you the shortest term unless it demeans the seriousness of the offense and does not adequately protect the public. Well, given your conduct with the gun, knowing you shouldn't have it, taking it off the mantle, drinking, using drugs, playing with it, holding it up to the victim, Miss Davis, clearly in my opinion, those facts indicate that the shortest term does not adequately protect the public. Obviously seeing the impact on Miss Davis and her family, clearly to me the shortest term would demean the seriousness of the offense.
>
> The court then moves to whether or not the longest term is appropriate. And I have to find one of the following. One is that the statute requires the maximum term, and that's not here.
>
> But the other two factors: Committed the worst form of the offense and the other option – I only have to find one – is the offender possesses the greatest likelihood of committing future crimes.
>
> Partially on the future crime issue, the court's troubled that you knew you shouldn't have a weapon there based on your prior felony conviction. You consciously took the weapon off the mantle. You played with it. You were drinking. You were using drugs.

*Transcript*, at 532-38.

In *Blakely,* the United States Supreme Court applied the rule of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt"):

> [T]he "statutory maximum"... is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the*

> *jury verdict or admitted by the defendant....* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," *Bishop, supra,* § 87, at 55, and the judge exceeds his proper authority.

*Blakely v. Washington, supra,* 542 U.S. at 303-04 (emphasis in original) (citations omitted). In petitioner's case, the trial judge based petitioner's sentence on the jury's verdict of guilt of felonious assault and on petitioner's prior felony conviction -- *i.e.,* both factors permissible under *Blakely.* Therefore, the trial court's imposition of the maximum term of eight years on petitioner's felonious assault conviction did not violate *Blakely.*

Claim one is without merit.

## CLAIM TWO

Petitioner has withdrawn claim two. *Traverse,* at 3. This Court will therefore not consider this claim.

## CLAIM THREE

In claim three, petitioner asserts that he was denied the effective assistance of trial and appellate counsel because his attorneys failed to raise a *Blakely* issue either at sentencing or on direct appeal. Petitioner first raised his claim of ineffective assistance of trial counsel in his appeal before the Ohio Supreme Court. Respondent therefore contends that this claim is procedurally defaulted, because the Ohio Supreme Court does not ordinarily consider claims not first raised in the appellate court below. *See Mitts v. Bagley,*

22

2005 WL 2416929 (N.D.Ohio September 29, 2005) (habeas petitioner's failure to raise a claim in the Ohio Court of Appeals precludes review by the Supreme Court of Ohio), citing *Fornash v. Marshall*, 686 F.2d 1179, 1185 n. 7 (6th Cir.1982) (citing *State v. Phillips*, 27 Ohio St.2d 294, 302, 272 N.E.2d 347 (1971)).

Citing *State of Ohio v. Scranton Buchanan, supra*, petitioner argues that the Ohio Supreme Court has considered *Blakely* claims raised for the first time in that Court. *Traverse,* at 4. Alternatively, as cause for his failure to raise on appeal a claim of ineffective assistance of trial counsel, petitioner asserts the ineffective assistance of appellate counsel. *See id.*, at 5; *see Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000)(the ineffective assistance of counsel may constitute cause for a procedural default, so long as such claim has been presented to the state courts and is not, itself, procedurally defaulted.) Petitioner's claim of ineffective assistance of trial and appellate counsel, however, lacks merit.

The Sixth Amendment guarantees the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177

(6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.,* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.,* at 697. Because the petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland*, 466 U.S. at 697.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp,* 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*,  463 U.S. 745, 751-52 (1983)).

Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic. The Court of Appeals for the Sixth Circuit has identified the following factors to be considered in determining whether counsel on direct appeal performed reasonably competently:

A. Were the omitted issues "significant and obvious?"

B. Was there arguably contrary authority on the omitted issues?

C. Were the omitted issues clearly stronger than those presented?

D. Were the omitted issues objected to at trial?

E. Were the trial court's rulings subject to deference on appeal?

F. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

G. What was appellate counsel's level of experience and expertise?

H. Did the petitioner and appellate counsel meet and go over possible issues?

I. Is there evidence that counsel reviewed all the facts?

J. Were the omitted issues dealt with in other assignments of error?

K. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir.1999). The Sixth Circuit cautioned, however, that this list is not exhaustive and need not produce a certain "score." *Id.* at 428.

Because, for the reasons stated *supra,* this Court concludes that the trial court did not violate *Blakely* in imposing a maximum term of incarceration, petitioner cannot establish prejudice by reason of his attorneys' failure to raise a *Blakely* issue, either before the trial court or on appeal. Petitioner's claim three is therefore without merit.

Therefore, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

If any party objects to this *Report and Recommendation,* that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matt er to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).


November 3, 2009                                    *s/Norah McCann King*
                                                    Norah McCann King
                                                    United States Magistrate Judge